[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Review of the File
This matter first came to the court by virtue of summons and complaint dated May 15, 2000 and returnable June 13, 2000, in which complaint the plaintiff petitioner prayed for a decree of dissolution of said marriage, a reasonable division of the parties' marital assets and a reasonable allocation of the parties' marital debt and such other relief as the court may deem fair, reasonable and equitable.
The usual automatic orders accompanied the complaint as well as the return by the state marshal indicating in-hand service on the defendant.
On May 25, 2000 the defendant filed a pro se appearance with the court.
On September 25, 2000, the Case Management Agreement was filed with the court.
On December 20, 2000, the defendant appeared by counsel.
On October 25, 2001, financial affidavits were filed with the court by the plaintiff and the defendant as well as accompanying financial data.
On October 26, 2001, the defendant filed an answer to the complaint and a cross complaint and in the cross complaint requested a dissolution of the marriage, an allowance to defend and such other relief as in equity may appertain.
Certain proposed orders were also filed with the court on October 26, 2001 by counsel for the plaintiff and the defendant.
An examination of the file appears to reflect that from the time of the initiation of the complaint to the date of hearing that no pendente lite orders were heard nor any orders entered incident thereto.
The plaintiff with her counsel and the defendant with his counsel appeared before the court on October 25, 2001 and October 26, 2001 and the matter was heard to a conclusion. CT Page 15359
From the testimony and exhibits, the court makes the following findingsof fact:
The plaintiff's maiden name was Labutis.
The plaintiff and the defendant were joined in marriage on December 16, 1972 in the town of Ledyard, Connecticut.
Both parties have been life-time residents of this state.
There are no minor children issue of this marital relationship.
There were no children, minor or adult, issue of this relationship.
Neither party has been the recipient of welfare or assistance from the State of Connecticut or any town, city or municipality or subdivision thereof.
The present marital union is the second marriage for each of the parties.
The marriage of the parties has irretrievably broken down with no reasonable prospect for reconciliation.
The plaintiff and the defendant have been living separate and apart since August 1, 2000.
The plaintiff presently resides with her daughter issue of the prior marital union.
The plaintiff conducts a business known as Jackie's Vending; the same being reflected on her financial affidavit.
The plaintiff has assistance in managing her business account in the person of a manager from Vernon.
The real estate reflected on plaintiff's Schedule D in the town of Somers is real estate in which the plaintiff has a fractional interest. The plaintiff's stepmother resides in the subject premises.
The plaintiff's father passed away in 1981.
The Somers property at 49 Mountain Road entitles the occupant to a life use and the plaintiff's fractional interest is with her siblings.
The plaintiff at the moment apparently does not currently have health CT Page 15360 insurance. The plaintiff had been inclined to the view that she did have coverage but was recently advised that it was no longer in full force and effect.
The plaintiff treats with Dr. Kerland for high blood pressure.
Among the plaintiff's list of requests of the court is the continuation of Cobra health insurance as available to her spouse.
The plaintiff indicated, however, a willingness to be personally responsible for that cost and charge.
The plaintiff testified that she made no claim for alimony even though this is a lengthy marriage.
The plaintiff is desirous of retaining certain cemetery plots in the Maplewood Cemetery in Norwich where kinfolk are interred. The plaintiff is desirous of retaining apparently the four remaining plots left in the cemetery.
The plaintiff testified that she sought nothing from the defendant.
The plaintiff acknowledged that the defendant received a modest pension from Pfizer's but made no requests incident thereto.
The plaintiff is apparently presently eligible for Social Security.
The plaintiff is desirous of retaining all of the assets shown on her financial affidavit.
It was represented to the court that the items of personal property of the parties have already been apportioned, set aside and settled.
The plaintiff owns the 1993 Ford Explorer motor vehicle reflected on her financial affidavit and makes no request for a motor vehicle from the defendant.
In the past, the plaintiff has received gifts from her late father and from an aunt.
It is represented that the defendant's mother has passed away and the plaintiff represented that she made no claim against any interest that the defendant may have in his mother's estate.
At one point in time, the plaintiff explored going into a business having to do with car seats for children; however, that was not pressed CT Page 15361 to a conclusion.
The plaintiff as noted, conducts a vending business. The vending business consists of the ownership of various dispensing machines which dispense candy, chips, soda, and matters of like nature. This business was commenced in 1997. The plaintiff is apparently the sole proprietor. The plaintiff is desirous of retaining her total interest in that asset.
The plaintiff represented that she was willing and disposed to pay for her own debts and her own counsel's fees.
The plaintiff's proposal to the court was that each party keep what they presently have under their care and control.
The plaintiff's business known as Jackie's Vending owns 17 dispensing machines. Originally the plaintiff purchased 12 machines. They were purchased from a firm known as Antares.
The plaintiff apparently has had prior guidance and experience in the vending business.
At one point in time, the plaintiff and the defendant also owned a series of laundromats. The plaintiff started the vending business and according to the testimony paid $50,000.00 for the original 12 machines.
Subsequently, the plaintiff purchased other vending machines which dispensed coffee. These coffee machines were at a cost of $2,000.00 each.
The plaintiff works six days a week in servicing and attending to the machines and keeping them stocked.
Occasionally the plaintiff's daughter, incident to the first marriage, helps her out with the vending business.
On some occasions in the past, the defendant would drive the plaintiff around to the various locations where the machines were placed.
At one point in time, the plaintiff and the defendant conducted a business entity that was known as RJ Management. Their accountant was a gentleman by the name of Raymond Serra.
According to the testimony, in 1999 the net profit from Jackie's Vending was $15,811.00.
Jackie's Vending maintained an account at the Dime Savings Bank. CT Page 15362
Funds which came into the plaintiff's possession from her late father and uncle were always kept separate and apart from any business interest or the separate assets of the parties.
In acquiring the first set of vending machines, which as noted above, cost $50,000.00, the plaintiff borrowed $25,000.00 from a sister of hers by the name of Jean, and she took $25,000.00 from inheritance funds that she had secured.
During the marriage there were joint businesses in addition to RJ Management including an entity known as the Blueberry Inn.
The testimony was to the effect that during the life of the marriage the defendant has bought and owned stocks.
The business entity known as RJ Management was formed 15 years ago and the testimony was to the effect that it was an umbrella for various business activities.
According to the testimony, the defendant controlled the money flow.
The Blueberry Inn, which was established by the parties, was a bed and breakfast business. It was sold August 1, 2000.
There were several laundromats under the RJ Management umbrella. The plaintiff worked at one or more of the laundromats initially and the plaintiff and the defendant worked together in other business entities wherein they were acting in the capacity of a landlord and were maintaining, rejuvenating and looking after various real estate entities.
Prior to 1973, the plaintiff worked for the Norwich Bulletin.
The entity known as the Blueberry Inn Bed and Breakfast was originally acquired in 1989.
The plaintiff managed the same, did cleaning, cooking, gardening, took care of the guests. From this particular activity, the defendant took a weekly $100.00 draw and the plaintiff took $50.00 as a weekly draw. Subsequently, the plaintiff received a $100.00 draw. This commencing about four years ago.
At one point in time, the plaintiff was required to pay the sum of $32,400.00 as concerns an income tax liability attributable, at least in part, to the defendant. CT Page 15363
The plaintiff characterized the defendant as being financially tightfisted.
Incident to the Blueberry Inn activity, the plaintiff purchased various furnishings including a $3,000.00 dining room set, a $1,800.00 corner cupboard, a lowboy desk and other items; these furnishings being paid for by the plaintiff out of her inheritance monies, according to the testimony.
At one point in time, the parties owned a home in Montville in which an in-ground pool was put in place at a cost of $12,000.00 to $13,000.00, which, according to the testimony, was paid for by the plaintiff from her inheritance funds. Also at the Blueberry Inn, a gazebo was constructed and brick walks and paths were installed, paid for by the plaintiff to a cost of approximately $10,000.00.
The plaintiff on the occasion of the 25th anniversary of the parties' marriage paid $5,800.00 for an anniversary party.
When the business entity and the real estate and improvements thereon known as the Blueberry Inn were sold, there was remaining after the payment of debts, obligations, attorney's fees, agent's commissions and so forth, the sum of $155,000.00, which was split equally between the two parties.
The defendant's mother, according to the testimony, passed away in 1986 and as a result thereof the defendant received title to a home in Key Largo, Florida. The defendant disposed of said property by sale in 1992 and received $23,000.00 + as a result thereof The testimony was to the effect that the defendant kept and retained these funds notwithstanding the plaintiff's claim that she paid a portion of the taxes on the Florida property while owned by the defendant.
At one point in time, the plaintiff undertook to purchase a life insurance policy on the defendant's life.
At one point in time, the defendant apparently was affected by a deer tick and had episodes of Lyme Disease. It is represented that the defendant's present physical condition, however, is all right.
The plaintiff owns the life insurance policy earlier adverted to.
After 14 years into the marriage, the plaintiff received a diamond ring valued at $15,000.00. The diamond, which the plaintiff had earlier owned, was retained by the defendant. CT Page 15364
A Rolex watch was acquired ten years ago at a price of $6,900.00 by the defendant.
At one point in time, certain property located on East Hebron Turnpike in Lebanon was sold and the proceeds therefrom apportioned between the plaintiff and the defendant.
At one point in time, as a result of tax and other financial problems that beset the parties, the plaintiff testified that she paid the sum of $42,000.00 incident to what was described as a short sale involving the bank.
The plaintiff is on medication, Evista, for blood pressure, and Norvasc as a preventative for breast cancer; otherwise, her health is good.
The early years of the marriage were described as being tranquil and beautiful.
The testimony was to the effect that the only instance of physical abuse was during the first year of the marriage where the plaintiff claimed that the defendant had struck her.
The plaintiff indicated that she felt that she had been financially abused and emotionally abused. The plaintiff characterized the defendant as very controlling.
The plaintiff's lament was to the effect that the defendant withheld information from her that would have helped and assisted her in various aspects of life.
The plaintiff acknowledged that she allowed herself to be controlled and that she tried, in her words, to keep the peace.
The plaintiff's testimony was to the effect that the defendant had a fiery temper.
The plaintiff's testimony was to the effect that the defendant never exhibited or showed his paychecks to her and the plaintiff indicated that, by and large, she had to "pay her own way."
At one point in the relationship, the defendant purchased a computer initially for the conduct of the business. The defendant used that for the purposes of day trading and apparently lost certain sums incident thereto. CT Page 15365
The plaintiff's complaint was to the effect that the computer was also used for sexually explicit matters and that the defendant had a variety of tapes incident thereto.
The testimony indicated that before the marriage that the plaintiff had been employed by the Norwich Bulletin for a term of nine years.
Prior to the marriage, the defendant had been employed at Pfizer's and had been there for 18 years when he left during an early portion of the present union.
Some of the properties owned or managed by the plaintiff and the defendant were located in Taftville.
In addition, the plaintiff and the defendant did contracting work.
At one point in time, the defendant worked and was employed by Electric Boat.
The coverage which was available to the plaintiff earlier for health and medical purposes was Anthem Blue Cross/Blue Shield incident to the coverage that the defendant had or continued from his former employment at Pfizer's.
The aforementioned cemetery lots, which the plaintiff is desirous of retaining, were valued at $400.00 each.
The plaintiff's testimony was to the effect that she has an interest in a certain trust established by an aunt. The aunt retaining control of the same until such time as she might expire and apparently nothing presently available to the plaintiff.
The aforementioned aunt was indicated to be age 89 and resides in a convalescent home and is afflicted with Alzheimer's Disease.
As noted on the plaintiff's financial affidavit, the Antares vending machines, which were purchased, according to the testimony, at a cost of $55,000.00 now, are valued at the sum of $1,250.00.
The parties are no longer in the laundromat business.
The rental properties which the parties purchased, renovated and maintained were in the early years of the marriage and are not presently owned by the parties.
The defendant retired from Pfizer's in 1983. CT Page 15366
At the time of the sale of the premises known as the Blueberry Inn, the plaintiff did receive some funds in acknowledgment of the furnishings which she had placed in the inn to the total amount of about $3,800.00.
In 1989 the defendant went to work at Mohegan Sun.
The aforementioned property in Lebanon was sold and each netted from the proceeds, $7,500.00.
As concerns the sale of the Blueberry Inn and the proceeds received, the plaintiff's testimony was to the effect that she put $45,000.00 in her safe and retained the difference in other asset form.
According to the testimony of the defendant, he spent $50,000.00 for the present mobile home that he owns and possesses and has some funds in the Dime Savings Bank.
The testimony was to the effect that the entity known as RJ Management paid the life insurance premiums for the $500,000.00 life insurance policy presently outstanding which is on the defendant's life but which is owned by the plaintiff.
The plaintiff's financial adviser was a gentleman by the name of Michael Lorr.
During his tenure at Mohegan Sun, the defendant worked as a cashier.
Some of the real estate formerly owned by the properties ended up being set over to the Chelsea Savings Bank incident to financial problems which beset the parties.
The diamond earlier referred to and the Rolex watch were purchased at either Grader's Jewelers or Perry's Jewelers in New London.
The plaintiff made no claim to the effect that the defendant was involved in any extramarital relationship.
The plaintiff is age 63.
Admittedly, this is a long marriage; the second for both.
The plaintiff's education extended through one year in college,
Except for the one instance in the first year of the marriage, there was no testimony as to any physical violence or abuse. CT Page 15367
The plaintiff described the defendant's consumption of alcohol as moderate. There was no substance abuse.
Both parties had children incident to the first marital union.
The testimony was to the effect that the parties have been living separate and apart since August 1, 2000.
When the property known as the Blueberry Inn was sold, the sale price was $406,000.00. The basis apparently was $300,000.00 attributable to the cost of the erection of the structure and $75,000.00 for the land.
The Blueberry Inn was located in the town of Bozrah.
The plaintiff's principal lament was to the effect that the marriage broke down as a result of ill-advised day trading on the part of the defendant and his resorting to certain sexually explicit material on the computer.
From the testimony of the witness Seymour Nepiarsky of West Haven, the court finds that Mr. Nepiarsky is involved in buying, selling and maintaining vending machines; that he has been in this business activity since 1947. He does business as Nepi Vending Sales. He is involved in new and used equipment. The machines that he is familiar with have to do with the dispensing of coffee, candy, soda and matters of like nature. He was offered to the court as an expert in the field.
This witness testified that the firm known as Antares, sellers of vending equipment, and the type purchased by the plaintiff, had a poor reputation in the trade.
This witness indicated that because of the nature of the construction, which apparently left much to be desired, and matters of like nature, the resale value for used Antares' vending machines is practically nil.
This witness characterized the present value of the vending machines held by the plaintiff as worth no more than $1,500.00 or $1,600.00, and the coffee machines worth no more than $300.00.
The plaintiff offered the testimony of Mr. Raymond Serra. Raymond Serra is a certified public accountant. He has done tax work for the plaintiff and the defendant over the years.
Mr. Serra prepared the 2000 and 2001 tax returns or such returns as might be required for 2000 and 2001 to date, as might be necessary or CT Page 15368 required.
The prior accountant for the plaintiff and the defendant was a gentleman by the name of Wandell.
This witness Serra testified as to the foreclosure of certain rental properties which were taken over by the Chelsea Groton Bank and the tax consequences incident thereto. This was characterized as a short sale and involved debt forgiveness on the part of the bank in favor of the plaintiff and the defendant. The individual liability, according to this witness, for certain tax purposes was $25,000.00 to the Internal Revenue Service.
This witness Serra's testimony as to the value of the vending machines was at variance to that of the testimony of Nepiarsky.
Apparently as concerns the so-called short sale to the bank involving certain income-producing properties, the plaintiff was required to pay a tax liability of $25,000.00 because the plaintiff was solvent and apparently the bank regarded the defendant as being insolvent at that time.
The defendant is age 61. He is not currently employed. He collects unemployment compensation from the State. Prior to October 4th of this year he was employed at Mohegan Sun as a cashier. He handled cash. He started that position in April of 1999. He was terminated by a variance that limits what was allowed by the casino over the accounting for cash. There was no claim that the defendant had done anything wrong; the casino rules apparently mandated a cash variance of no more than $2,500.00 annually even in the event that the variance was a plus and a benefit to the casino rather than a loss.
On September 17, 2001, the defendant had a $2,000.00 overage incident to his employment activities and he was terminated by the casino for that reason; rather hard to understand by the court.
A review of that termination allegedly is pending but the defendant feels his prospects for reinstatement are slight.
The defendant has medical coverage with Blue Cross/Blue Shield Preferred, which he testified is good through the end of October of 2001. This in contradistinction to the testimony of the plaintiff.
The defendant's testimony was to the effect that he is eligible to continue on Cobra. The cost is $246.00 a month. CT Page 15369
The plaintiff's cost, according to the defendant's testimony for the coverage would be $236.00 a month. An application is in process for the plaintiff to have that benefit at her own cost and expense. That application is presently pending.
Initially the defendant met the plaintiff in 1972 at what was called a parent's party; although as noted, there were no children issue of this marriage.
The parties knew each other for three months prior to the marriage.
The defendant who has two children, now adults, moved in with the plaintiff at a location known as Laurel View which was owned by the plaintiff.
The defendant, while at Pfizer's, was a chemical operator, and as noted above, he was there for 18 years retiring in 1983.
The defendant was entitled to retirement benefits commencing in 1990, which he still enjoys.
The benefit received by the defendant for Pfizer's amounts to $161.45 a month. This is an entitlement for life.
During the marriage the parties had two apartment houses in Taftville. In addition, there was a property on Central Avenue and Boswell Avenue in Norwich. The defendant did a considerable amount of rehabilitative work on these properties which apparently needed a great deal of attention and fixing up. The plaintiff did the necessary book work and in 1986 this business activity was known as RJ Realty, LLC. Subsequently, it became RJ Management.
The aforementioned Blueberry Inn was apparently a structure that in large measure was built by the defendant who originally secured a loan of $150,000.00 to facilitate the building. As noted earlier, the land purchase was $75,000.00. The building at the Blueberry Inn was completed in 1989 and started as a business entity actively in 1993. The Blueberry Inn is located on Bashon Road in Bozrah.
Insofar as the rental properties were concerned, the plaintiff and defendant were beset with various problems generated by the location of the properties involving difficulties in maintenance, tenant problems and alleged drug use by tenants. A default by the parties occurred in 1998 which precipitated action by the bank and ended up being the so-called short sale. CT Page 15370
The defendant testified that on one occasion he lost $20,000.00 in day trading but subsequently recouped part of the loss.
The defendant first acquired a computer in 1993, according to his testimony, and went on the Internet. The defendant's testimony was to the effect that he did not resort to sexually explicit material on the Internet. This, of course, in contrast to the testimony of the plaintiff
The defendant indicated that during the first 20 years of this admittedly long marriage that the relationship was wonderful. The defendant affirmed, however, that presently it is irretrievably broken down and attributes the breakdown to financial problems. The defendant testified that matters of intimacy between the parties were also excellent and continued as such up until the time he was served with the papers. Neither party resorted to counseling to try to preserve the marriage.
The defendant makes no claim with regard to the cemetery plots which are a matter of concern by the plaintiff
The defendant testified that he is not making a claim for alimony.
The defendant testified he paid $8,486.00 to the Internal Revenue Service on the 1999 return filed by the parties.
During the conduct of the vending business, the defendant testified that he assisted in repairing and maintaining the machines and felt that the annual cost of maintenance for each machine was about $296.00.
Aside from the purchase by the defendant of the mobile home already averted to, the defendant put $28,000.00± in a five-year money market account at the Dime Savings Bank.
The Rolex watch owned by the defendant was originally acquired in the country of Portugal for $10,000.00. Later, apparently, the defendant "upgraded" this by the subsequent payment of another $6,000.00 for a new Rolex. This was purchased from Perry's Jewelers, which is located in Mystic.
At one point in time recently, the defendant put the watch on the Internet on consignment but the same did not sell.
The defendant's lament was that certain monies that he advanced to RJ Management were never repaid to him; that he, individually, had built the gazebo and other improvements on the property known as the Blueberry Inn and provided materials incident thereto. The defendant's request of the CT Page 15371 court is for equality of assets.
The defendant's testimony with regard to the sexually explicit material; to wit, certain tapes, was to the effect that on being apprised of the plaintiff's concern in that respect that they were put into a bag and taken to a local dump and discarded.
The defendant described the plaintiff's testimony as concerns her claimed offense at certain explicit material as being untruthful.
The defendant acknowledged that on occasion he had suffered losses in day trading but no longer engaged in the same.
From the exhibits presented to the court, the court makes the followingfindings.
See Plaintiff's Exhibit A, entitled "Advisor Connect" an online service and transactions account list by product, total value of accounts shown in name of (INO) Jacqueline L. Dows and Raymond E. Dows, $63,682.42.
See Plaintiff's Exhibit B, a document entitled "MFS Utilities Fund B", INO Jacqueline L. Dows, total value portfolio $3,641.42.
See Plaintiff's Exhibit C, Town of Somers Assessor's Card, as concerns the aunt of the plaintiff, Eleanor C. Labutis, indicating the total assessment as concerns said property (real estate) $104,870.00; that is the assessment figure. The total estimated market value is $149,820.00.
See Plaintiff's Exhibit D, a brochure or colored ad entitled "The Revolutionary Compact Refreshment Center," offering Antares-type vending machines and depicting pictures thereof
See Plaintiff's Exhibit E, Income Versus Spending Statement as concerns Jackie's Vending for the period 1/1/99 through 12/31/99. Total income categories, $54,579.16. Total expenses, $38,767.21.
See Plaintiff's Exhibit F, entitled "Account Transactions, Jackie's Vending," for the period 1/1/2000 though 5/25/2000 indicating costs and expenses with regard to product and expenses and matters of like nature. Expenses for the stated period as shown on Plaintiff's F amounted to $10,143.23.
See Plaintiff's Exhibit G, four checks, the first dated June 21, 1992 for $5,000.00 from the plaintiff to the defendant. The second dated July 31, 1992 in the amount of $6,000.00 from the plaintiff to the defendant. The third dated January 28, 1993, $5,000.00 from the plaintiff to the CT Page 15372 defendant and the fourth dated January 31, 1997, $5,000.00 from the plaintiff to the defendant, and further, another check dated February 7, 1997 in the amount of $6,400.00 from the plaintiff to the defendant.
See Plaintiff's Exhibit H, the settlement statement as concerns the sale by the plaintiff and the defendant to an entity known as Sanborn Corporation for the property at 40 Bashon Hill Road in Bozrah (Blueberry Inn) verifying the contract sales price at $406,000.00 and net cash to the sellers of $155,680.94.
See Plaintiff's Exhibit I, IDS Life Insurance Company flexible premium variable life insurance policy. The insured life is Ray E. Dows. The amount of the policy is $350,000.00 and the beneficiary is the plaintiff. The plaintiff is also the owner of the policy.
See Plaintiff's Exhibit J for a valuation as to the 1993 Ford Explorer sport utility; trade-in value as of the date of the exhibit, $3,755.00. The exhibit is dated October 24, 2001.
See Plaintiff's Exhibit K, settlement statement as concerns Lot 1, East Hebron Turnpike, Lebanon, Connecticut. The contract sales price being $50,000.00. The sellers being the plaintiff and the defendant. The purchaser, one, Oliver Woods, LLC. The settlement date on the exhibit is June 29, 2000.
See Plaintiff's Exhibit L, a valuation estimate from Perry Jewelers directed to the defendant valuing a ladies' diamond solitaire at $19,000.00, a ladies' Rolex watch at $14,000.00 and a gentlemen's Rolex watch at $20,650.00.
See Plaintiff's Exhibit M, a reject notice as concerns the continuation of medical coverage for the plaintiff wife issued by Blue Cross.
See Plaintiff's Exhibit N, State of Connecticut Sales and Use Tax permit for Seymour Nepiarsky, earlier adverted to in this memorandum as a witness in the proceedings valuing vending machines.
See Plaintiff's Exhibit O, purchase invoice with regard to coffee machines purchased by the plaintiff.
See Plaintiff's Exhibit P, a commercial lease as concerns the Bashon Hill Road, Bozrah property. A lease apparently between the plaintiff and the defendant, individually, and the plaintiff and the defendant as a partnership doing business as Blueberry Inn. This lease provided for annual rent of $15,000.00 payable in equal monthly installments of $1,250.00 as concerns the subject property. CT Page 15373
See Defendant's Exhibit A, United States Federal Income Tax Return for the year 2000, INO Jacqueline Dows, indicating that her total adjusted gross income for the year was $42,809.00.
See Defendant's Exhibit B, a voluminous, multi-paged exhibit with a detailed breakdown of coin, cash receipts from the various and sundry machines and allied matters over a long period of time.
See Defendant's Exhibit C, financial affidavit of the plaintiff dated September 24, 2000 showing a net weekly wage of $250.00, investment and other income of $120.00, for a total net weekly income of $370.00. Total cash value of assets as reflected on that financial affidavit was $236,546.00 and no liabilities.
See Defendant's Exhibit D, financial affidavit filed by the plaintiff under date of January 11, 2001 indicating that her net weekly income was $370.00 a week, weekly expenses of $401.00, total value of assets on that financial affidavit, $186,546.00.
See Defendant's Exhibit E, a quitclaim deed from Charles F. Labutis to his wife, Eleanor Labutis, and the children of that union as concerns property on Mountain Road in the Town of Somers. The instrument provides for a life use for Eleanor Labutis.
See Defendant's Exhibit F, inventory as concerns the Court of Probate for the Probate District of Somers pertaining to the estate of Charles F. Labutis, Jr. The estate shows the real estate on Mountain Road and other assets which total $146,157.00.
See Defendant's Exhibit G, a letter from a law firm in Hartford directed to the defendant's attorney to which is attached a document entitled "Anna L. Hollack Trust Agreement." The plaintiff is a residuary beneficiary under the terms and conditions of this particular trust indenture.
See Defendant's Exhibit H, a document entitled "Account Transactions for Jackie's Vending," dated March 13, 2001 indicating figures pertaining to the period 1/1/97 through 12/31/97 wherein the total vending machine expenses and supplies incident thereto plus obligations to Antares Corporation, amount of $56,266.20.
See Defendant's Exhibit I, United States Partnership Income Tax Return for 1999 for the partnership Ray E. Dows and Jacqueline Dows, RJ Realty Management, LLC. This exhibit shows gross receipts or sales for that tax period of $111,861.00. Expenses and allied matters indicate a loss CT Page 15374 for the year to the amount of $7,201.00.
See Defendant's Exhibit J, Federal Partnership Income Tax Return for the year 2000 for Ray E. Dows and Jacqueline Dows, and RJ Realty Management indicating gross receipts of sales, $36,704.00, ordinary income for the period for the subject entity, $2,852.00.
See Defendant's Exhibit K, a statement from Pfizer's directed to Mr. Ray E. Dows. The document verifies a certification of the defendant's vested benefits under the Pfizer Retirement Annuity Plan. Page two of the exhibit states: "If you elect a single life annuity to commence at age 50, your benefit will be $171.00. A joint and survivor annuity would at that age provide you with a benefit of $161.45 for your life and $80.72 for the life of your surviving spouse."
See Defendant's Exhibit L, 1999 Federal Income Tax Return for the defendant, Ray E. Dows, indicating total income for that year to the amount of $62,981.00. The major portion thereof having to do with a capital gain. Wages and salaries in the 1999 return is reflected in that exhibit, amounted to $11,889.00.
Findings based on the financial affidavits filed by the plaintiff andthe defendant, including the corrected financial affidavit of theplaintiff.
According to the plaintiff's financial affidavit, her occupation is entitled that of operating vending machines, self-employed. Gross weekly wage from that endeavor is shown as $275.00 a week with deductions, taxes, etc., of $53.00, for a net of $223.00 a week. In addition thereto, there is shown investment income of $80.00 a week, deductions of $16.00, for a total of $64.00 from other sources. Total net weekly income, $286.00. Total weekly expenses as shown on the corrected affidavit, $335.00. A single debt in the amount of $5,000.00. No real estate shown. A 1993 Ford motor vehicle valued at $3,775.00. A Dime Savings Bank account in the amount of $1,300.00 and cash in the amount of $44,371.00. American Express brokerage account, $30,554.00. Mutual funds, $12,823.00. Other stocks (Lucent, Pfizer, USVO) $33,307.00, for a total of $76,684.00. Cash value of life insurance policy owned by the plaintiff, $25,280.00. IRA accounts, $660.00. Other assets valued at $45,130.00, for a total cash value of all assets of $196,999.00.
To the corrected financial affidavit was attached a Schedule A, Schedule B, Schedule C and Schedule D which itemized with particularity the aforementioned figures.
From the financial affidavit of the defendant, the court notes that he CT Page 15375 lists his occupation as presently unemployed. Weekly income, presumably from unemployment compensation, gross $214.00; deductions, $27.00, net $187.00. Other income from Pfizer's, $37.00 a week, withholding of $5.00, for a net of $32.00, for a total net weekly income of $219.00. Total weekly expenses, $294.00 according to the affidavit. A creditor listed as Margin Account, balance due, $11,550.00. The defendant shows a mobile home located at 260 Raymond Hill Road, Lot 5, Uncasville, valued at $50,690.00. A 1995 Toyota automobile valued at $10,710.00 with an equity of $8,220.00. A Rolex watch and a diamond ring valued at $11,000.00. Dime Savings Bank, $1,000.00. Stocks, bonds, etc., after the Margin Account, value of $15,681.00. A Merrill Lynch 401K, $2,800.00; total cash value of all assets $89,391.00.
 Discussion
The court notes that during the pendency of these proceedings there were no pendente lite orders of any sort entered prior to the matter coming on for a hearing on its merits. The marriage is one that is for 28 years and 11 months.
There were no children issue of this marital union and it is the second marriage for both.
The parties have been living separate and apart since August 1, 2000.
The plaintiff presently resides with her daughter issue of a prior marital union.
The plaintiff treats for high blood pressure, takes medication of Evista and Norvasc.
The plaintiff asked the court to consider the health coverage option for her benefit presumably at her cost and expense.
The plaintiff indicated in clear terms that she made no claim for alimony.
The plaintiff appears to be eligible for Social Security.
As indicated in the findings, the plaintiff paid various sums during the course of the marriage including $32,400.00 as concerns an income tax liability of the defendant.
Again, as noted, the plaintiff, incident to the property known as the Blueberry Inn, and the conduct and subsequent sale thereof, purchased various furnishings and paid for items such as the gazebo, brick walks CT Page 15376 and so forth.
The plaintiff apparently also was obligated to come up with $42,000.00 with regard to the short sale involving the mortgagee bank.
The testimony revealed only one instance of alleged physical violence in the first year of the marriage.
There is no claim of any extramarital relationships outside the bounds of the marriage.
The plaintiff is age 63. Her education extended through completing high school and one year of college.
As testimony indicated, no problems with regard to alcohol nor drugs.
The claim by the plaintiff as to the cause of the dissolution is that of the defendant using a computer, ill-advised conduct with regard to stock trading and certain explicit material.
The defendant is age 61. He is not presently employed. He collects unemployment compensation.
The defendant apparently is still eligible for health coverage on the basis of his former employment. The defendant has apparently no objection to the plaintiff opting for such medical benefits as may be available incident to his coverage but at her cost and expense.
The defendant makes no claim as to the cemetery plots which were involved in the proceedings.
The defendant expressly made no claim for periodic alimony in the matter.
As noted, the plaintiff's claim throughout the proceeding is that the majority of her assets were acquired through inheritance. of course, the fact that assets are accumulated through inheritance does not necessarily isolate them from the court's consideration with regard to an appropriate division of marital assets once there is a petition filed for dissolution.
The claim by the plaintiff as to certain explicit material was clearly contradicted by the defendant who testified that matters went well in the marriage up until the time that he was served including matters of intimacy.
The court also notes that while plaintiff's counsel held a particular CT Page 15377 object in his hand, allegedly being the defendant's "favorite tape," it was not offered.
Admittedly, both of the parties put in long hours with regard to their economic activities over the course of this, again, admittedly long marriage.
Having a computer is no sin. If that were the case, most of our unions today would be flawed. Day trading, if done responsibly, is also not an egregious fault. There are many problems and trials to be born by parties incident to the marital union. No marriage is perfect. The evidence clearly indicates that the parties worked side by side in many endeavors. It may be that the acquisition of diamonds or Rolex watches was rather improvident under the overall circumstances. Whether or not the plaintiff may receive certain wealth or funds from the estates or trusts of individuals established is a matter of conjecture. The assets of the grantor may well be exhausted before ever coming to hand.
To the extent that economic conditions contributed to problems resulting in the short sale to the bank, those were undoubtedly forces over which the parties had no direct control.
 The Law
The court has considered all of the statutes which apply in matters of this nature which include without limitation Connecticut General Statutes (C.G.S.) § 46b-82 regarding alimony. The court has considered the provisions of this statute notwithstanding the fact that both of the parties have disavowed any claim as to periodic alimony.
The court has considered all of the applicable case law that govern the matter.
The court has considered the testimony of the parties, their candor or lack thereof and the arguments of both counsel.
The court has considered the exhibits presented to the court.
The court has considered the length of the marriage, the cause of the breakdown and dissolution, the age, health, station, occupation and employability or prospects thereof of each of the parties and the estate and needs of the parties.
The court has considered the standards of living of the parties.
The court has considered the respective financial positions of the CT Page 15378 parties and their prospects, if any, for future income and opportunities.
The court has considered the issue of fault.
The Court enters the following orders.
The court grants the relief prayed for and dissolves the marriage on the grounds of irretrievable breakdown and declares the parties to be single and unmarried.
The defendant shall provide whatever assistance and cooperation is needed so as to allow the plaintiff to maintain available COBRA health insurance coverage through defendant's former employment for the period allowed. Any premium expense for said coverage shall be the sole responsibility of the plaintiff.
If post-dissolution health insurance is available to the plaintiff at no cost or nominal cost through defendant's former employer, then defendant shall provide whatever assistance and cooperation is required in order to enable plaintiff to obtain such insurance, but again, at her cost and expense.
The court will accede to the direct requests of both the plaintiff and the defendant and enters no order of periodic alimony as to either the plaintiff or the defendant.
Each of the parties are represented by competent counsel who have apparently advised their clients as concerns the nature of said request.
The defendant shall transfer to the plaintiff for no consideration any rights he has, ownership or otherwise, to a cemetery plot located in Maplewood Cemetery in Norwich, Connecticut. Any costs associated with ownership of said plot shall thereafter become the sole responsibility of the plaintiff and with respect thereto plaintiff shall indemnify defendant and hold him harmless therefrom.
Each party, the plaintiff and the defendant, shall keep and retain as his or her own property, free and clear of any claims from the other party any pension plans, IRA's, 401K's and matters of like nature.
The parties have already, on the basis of information made known to the court, divided all joint marital personal property and each may retain the property presently in their possession.
The plaintiff may keep and retain as her own and separate property, free and clear of any claims from defendant, a certain 1993 Ford Explorer CT Page 15379 motor vehicle presently in the possession of the plaintiff
The defendant shall keep and retain as his own property, free and clear of any claims from plaintiff, a certain 1994 Toyota Avalon motor vehicle which he presently has in his possession. Any documents necessary to achieve this end result shall be executed by the parties.
As concerns matters of inheritance or prospective inheritance, each party may have, hold and keep whatever sums, funds or assets may come into their possession from this date forward as concerns anticipated legacies or by being the beneficiaries of outstanding trusts, trust indentures; the value thereof at this juncture manifestly is speculative.
In the event that success should attend the efforts of the plaintiff in a newly explored business venture involving her daughter by a prior union and a third party, the plaintiff may keep and retain the anticipated proceeds thereof, if any, free and clear of any claim by the defendant.
The plaintiff may keep and maintain and continue to operate the vending machine business known as Jackie's Vending which has been the sole source of her earned income of late. The court acknowledges that the defendant has participated in that business from time to time and has given assistance incident thereto; however, it would appear that the business, such as it is, was the result of the principle and primary activity and efforts of the plaintiff
Each of the parties shall be responsible for the debts reflected upon in their financial affidavits and be solely responsible therefor.
The plaintiff may continue to keep in full force and effect the life insurance policy which she owns on the life of the defendant and it shall remain her sole and separate property.
The plaintiff shall be solely responsible for the continued payment of any present or future premium obligations or any other indebtedness associated with the ownership of said policy.
The defendant may keep and retain his mobile home at 260 Raymond Hill Road in Uncasville and any interest he may have in the land on which it is situated.
The defendant may retain his Rolex watch and diamond ring.
The defendant may retain his Dime Savings Bank checking account and his stocks and securities valued at, according to his financial affidavit, $15,681.00. CT Page 15380
As earlier noted, he may of course retain his Merrill Lynch 401K.
Mindful of the defendant's request through counsel of equality of assets, the court notes that the figure arrived at by defendant's counsel with regard to the alleged total of the plaintiff's assets include $150,000.00 from an Intervivos Trust which is outstanding, which may or may not ever come to fruition and the prospective anticipated receipt of $24,680.00 from the fractional interest in the real estate in Somers.
While the court feels that there is some balance that should be struck between the parties, but again, mindful of the various and sundry sums which the plaintiff has paid out for various purposes as noted above, the amount necessary to create "a balance between the parties" must of necessity be much more modest than what the defendant would request.
The plaintiff, from the cash reflected on her financial affidavit, shall set over and deliver to the defendant the sum of $25,000.00; the same to be set over and delivered within 30 days from the date hereof.
In all other respects, the parties may each retain the assets, stocks, bonds and any other item of value as reflected upon in their respective financial affidavits and the schedules attendant thereto.
Each party shall be responsible for their own attorney's fees.
Austin, JTR